### IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| ANADARKO PETROLEUM CORP., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-06-2849 |
| | § | |
| BILLY DON DAVIS and | § | |
| GEOSOUTHERN ENERGY CORP., *et al.*, | § | |
| | § | |
| Defendants. | § | |

### FINDINGS OF FACT AND CONCLUSIONS OF LAW ON ANADARKO'S APPLICATION FOR A PRELIMINARY INJUNCTION AND ORDER

On June 30, 2006, Billy Don Davis, a petroleum engineer and long-time employee of plaintiff Anadarko Petroleum Corporation, resigned to join GeoSouthern Energy Corporation. Another former Anadarko employee, Margaret Molleston, had left Anadarko to join GeoSouthern as its vice-president in May 2006. Davis left Anadarko on July 14, 2006. It is undisputed that just before leaving Anadarko, Davis downloaded confidential or proprietary information from Anadarko's computers. When he joined GeoSouthern, Davis transferred that information to GeoSouthern's computers.

Anadarko sued Davis and GeoSouthern in September 2006. In its amended complaint, Anadarko asserts causes of action under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, breach of the duty of confidentiality, misappropriation of trade secrets, common-law misappropriation, conversion, breach of fiduciary duties, *respondeat superior*, aiding and abetting, and spoliation.

Davis has admitted that he misappropriated confidential or proprietary information, although he has denied any significant use of it and denied any use of it to Anadarko's detriment. After this suit was filed, the parties entered into an Agreed Order that this court entered on September 20, 2006. (Docket Entry No. 13). The Agreed Order requires Davis and GeoSouthern to do the following: return all of Anadarko's confidential or proprietary information; refrain from using any confidential or proprietary information belonging to Anadarko; account "fully and completely" for any information Davis brought to GeoSouthern from Anadarko; provide access to their business and personal computers and related equipment and systems to allow Anadarko to inspect and verify that no information belonging to Anadarko is or was present; and refrain from disclosing any confidential or trade secret information made available or possessed by Davis during his employment with Anadarko. (*Id.*).

Anadarko asks this court to impose additional restraints on both Davis and GeoSouthern. As to Davis, Anadarko seeks a preliminary injunction prohibiting him from working for any Anadarko competitor. As to GeoSouthern, Anadarko seeks a preliminary injunction prohibiting it from employing Davis and Molleston. (Docket Entry Nos. 11, 12, 18, 38).

Davis and GeoSouthern assert that there is no legal or factual basis to impose such broad restrictions on Davis's and Molleston's employment. They point to the absence of any Anadarko noncompete agreement and to the steps they have already taken and are required by the Agreed Order to take to return and refrain from using any Anadarko confidential or

2

proprietary information.   Anadarko responds that the evidence shows that Davis and GeoSouthern cannot be trusted to comply with the Agreed Order already in place.   Anadarko asserts that Davis and Molleston violated duties owing to Anadarko; that Davis's testimony as to his use of the information he took from Anadarko is not credible; and that Davis's and GeoSouthern's conduct in deleting information from GeoSouthern's computers amounts to spoliation that warrants an adverse inference as well as other sanctions.   (Docket Entry Nos. 11, 12, 18, 38).

This court held an evidentiary hearing on the preliminary injunction application beginning on September 11, 2006 and continuing on different dates until September 25, 2006.   Billy Don Davis and George Bishop of GeoSouthern and Michael Hoffman, Bradley Holly, Allen Sanders, and Andrew Rudderow of Anadarko testified.   The parties submitted designated excerpts from the depositions of  Margaret Molleston of GeoSouthern, Jeffrey Rawson, a consultant who worked with GeoSouthern, Gerry Drake of Anadarko, and Davis. The court also heard testimony from Jeffrey Frank, a computer forensic specialist.

Based on the pleadings, motions and responses, the parties' submissions, the evidence, the arguments of counsel, and the applicable law, this court enters findings of fact and conclusions of law denying Anadarko's application for additional preliminary injunctive relief beyond the Agreed Order already in place.   Specifically, this court declines on the present record to enjoin Davis from working for any Anadarko competitor or to enjoin GeoSouthern from employing Davis and Molleston.   With respect to the spoliation motion, this court denies the motion to the extent Andarko asks this court to expand the scope of the

Agreed Order to restrict Davis's and Molleston's employment as a sanction and to the extent Anadarko requests an adverse inference instruction.  This court otherwise defers decision on the sanctions motion and orders supplemental briefing on that issue.

The Findings of Fact and Conclusions of Law are set out below.

## FINDINGS OF FACT

### I.  Background

#### A.    The Parties

Anadarko is a large independently owned oil and gas exploration and production company.  Anadarko has interests in numerous wells in the Texas Gulf Coast Trend, a geographic region that runs in a northeasterly direction from southwest Texas near the Mexican border into western Louisiana.  More specifically, the Texas Gulf Coast Trend begins near Laredo, Texas, runs south of San Antonio, east of Austin, north of Houston, and extends into western Louisiana.  Areas within the Texas Gulf Coast Trend include the Giddings Field, the Pearsall Field, and the Brookland Field.  The Giddings Field includes all or part of Lee, Fayette, Washington, Burleson, Milam, Grimes, Brazos, Robertson, and Austin Counties in central Texas.  The Austin Chalk is the primary producing reservoir in the Giddings Field.

Billy Don Davis is a petroleum engineer.  He worked for Anadarko's predecessors, Union Pacific Resources Company and Champlin Petroleum Company, for approximately twenty years.  In June 2000, Davis began to work for Anadarko as a result of its merger with Union Pacific Resources Group, Inc.  Davis was working for Anadarko as a Senior Reservoir

4

Engineering Advisor when he resigned on June 30, 2006.  His work was primarily in the Giddings Field area known as the Austin Chalk.

Margaret Molleston worked for Anadarko as a Senior Landman.  She had also worked for Anadarko's predecessor, Union Pacific Resources, beginning in 1995.  Her experience was also focused in the Austin Chalk area.  In May 2006, Molleston resigned from Anadarko to become GeoSouthern's vice-president, serving directly below its owner and president, George H. Bishop.

GeoSouthern Energy Corporation is an oil and gas exploration company with interests primarily in the Austin Chalk.  GeoSouthern is owned by its president, George Bishop, who has operated wells in the Austin Chalk since 1979.  According to Bishop, GeoSouthern has partnered with Anadarko and its predecessor, Union Pacific Resources Company, on numerous properties in the Austin Chalk since 1991.  GeoSouthern and Anadarko have joint interests in a number of wells in the Austin Chalk as to which they share significant amounts of information.  Both Anadarko and GeoSouthern have interests in other wells in the Austin Chalk in which the other is not involved.  GeoSouthern has significantly fewer holdings in the Austin Chalk than does Anadarko, the single largest interest-holder in the area.  GeoSouthern handles drilling and operations; an affiliated company, American Flourite, owns the properties.

### B.    Anadarko's Policies Towards Its Employees

Anadarko did not require Davis or Molleston to sign noncompete agreements.  Although Davis and Molleston were among those with access to Anadarko's confidential and

proprietary information in their work, Anadarko relied on a Code of Business Conduct and Ethics and common-law obligations to prevent disclosure or use of its confidential and proprietary information for the benefit of others.  The Code prohibited employees from disclosing or discussing Anadarko's confidential and proprietary information and required employees to deliver any such information to Anadarko "on the termination of your association with us."[1]  (Pl. Ex. 11).  Anadarko employees must also agree to the following statement: "Do you agree that you will only access Anadarko's computers, networks, information systems, accounts, and confidential and proprietary information for legitimate business reasons consistent with the Code and Anadarko's operations, activities and business interests?"  (*Id.*).  Both Davis and Molleston signed the Code of Ethics annually during their employment at Anadarko.

In this case, Anadarko does not take the position that as a result of working at Anadarko for such a long time, Davis or Molleston knew so much confidential or proprietary information about the geographic areas where they worked as to make disclosure or use of

---

[1]  The Code provides in relevant part:

> All documents, records, notebooks, notes, memoranda and similar repositories of information containing information of a secret, proprietary, confidential or generally undisclosed nature relating to the Company or our operations and activities made or compiled by the director, officer or employee or made available to you prior to or during the term of your association with the Company, including any copies thereof, unless otherwise agreed to in writing, belong to the Company and shall be held by you in trust solely for the benefit of the Company, and shall be delivered to the Company by you on the termination of your association with us or at any other time we request.

(Pl. Ex. 11).

6

that information inevitable if they worked for a competitor or in the same area.  Anadarko acknowledged that had Davis not taken confidential or proprietary information when he joined Molleston to work at GeoSouthern, Anadarko would not seek to prevent Davis from working for a competitor or to prevent Molleston from working at GeoSouthern.  (Prelim. Inj. Hr'g Tr. 22, Sept. 11, 2006).  The basis for the relief sought is that Davis took Anadarko's confidential and propriety information and that Molleston was either allegedly involved in some manner or, when she was informed of Davis's action, failed to take appropriate steps.

Anadarko also has a section in the Code of Ethics addressing conflicts of interest.  The Code does not prohibit employees from participating in outside employment, self-employment, or serving as consultants or in other capacities for outside directors, unless that activity:  "1. reduces work efficiency; 2. interferes with your ability to act conscientiously in our best interest; or 3. requires you to utilize our proprietary or confidential procedures, plans or techniques."  (Pl. Ex. 11).  Anadarko also requires employees to inform their supervisor of any outside employment, including the employer's name and expected work hours, and to disclose in writing any interest held by employees in "oil, gas or coal properties, royalties or other mineral interest, or interests in companies either owning mineral interests or providing services or materials" to Anadarko.  (*Id*.).  Another section of the Code of Ethics addresses corporate opportunities.  It prohibits employees from taking opportunities discovered through the use of Anadarko "property, information or position"; using company

"property, information or position for personal gain"; or "competing with the Company."
(*Id.*).

### C.    The Evidence as to Davis's and Molleston's Departures from Anadarko

Davis had worked in the Austin Chalk region for Anadarko or its predecessors for
over twenty-six years.  One of Davis's supervisors, Michael Hoffman, described Davis's
responsibilities as a senior reservoir engineer as including the following:

- Providing reservoir engineering support for various portions of the Giddings Field.

- Providing reserve and economic evaluation for rig programs in the Giddings Field.

- Maintaining and updating the S.E.C. reserve booking database.

- Evaluating acquisitions for numerous Texas Gulf Coast Trend properties, which included the area known as Giddings Field.

(Docket Entry No. 11, Ex. E at 2).

Davis testified at the preliminary injunction hearing and in his deposition that he was
dissatisfied with his career at Anadarko.  He felt that he had been passed over for promotions
and "pushed to the side," and he believed that his supervisors—who were considerably
younger and less experienced—knew less than he did about the Austin Chalk and were
making "poor decisions."  (Prelim. Inj. Hr'g Tr. 139–41, Sept. 13, 2006; Davis Dep.
140:18–143:25).  Davis was "miserable" about his career prospects at Anadarko.  (Davis
Dep. 140:18–143:25).

As a senior landman, Molleston worked for Anadarko identifying and developing prospective oil and gas properties in the Giddings Field.  Molleston and Davis were friends through their long employment at Anadarko.  Molleston had worked with GeoSouthern and Bishop on several transactions for Anadarko, including in 2003 and 2004.  (Molleston Dep. 27:1–28:13).

In late 2004, Jeffrey Rawson, an investor for Merrick Capital Corporation who had worked frequently with Bishop on financing various deals, worked on a proposal that would have allowed Bishop to sell much of his interest in GeoSouthern to Rawson, Molleston, and Davis, while retaining some ownership interest himself.  According to Rawson, the proposed arrangement would have allowed Bishop to transition into retirement and allowed the partners to take over GeoSouthern's operations.  Molleston would be in charge of the business, Davis would be in charge of operations, and Rawson would function as financial advisor and capital provider.  (Rawson Dep. 106:17–107:21).  Rawson negotiated with General Electric Energy Financial Services ("GE") about possible financing for the proposal. According to Molleston, sometime after March 2005, Rawson, Bishop, Molleston, and Davis had dinner with a GE representative, Paul Gessinger, to make introductions.  Rawson and Davis put together a general "action plan" memorandum for a potential purchase of GeoSouthern.  Bishop changed his mind about retiring or selling and the discussions were terminated.  (*Id.* at 108:6–10).

Davis testified that he did not advise Anadarko about this possible acquisition of GeoSouthern because Anadarko had previously passed up a similar opportunity and because

9

Bishop had made it clear that he would not consider selling to Anadarko. (Prelim. Inj. Hr'g Tr. 162, Sept. 13, 2006). Anadarko's witnesses agreed that Anadarko had not been interested in acquiring GeoSouthern's interests in a "long, long time." (Prelim. Inj. Hr'g Tr. 46–47, Sept. 25, 2006). Davis did not view Bishop's interest in selling GeoSouthern to Rawson, Molleston, and Davis as a corporate opportunity that should have been presented to Anadarko; neither he nor Molleston advised Anadarko that they were pursuing it. (Prelim. Inj. Hr'g Tr. 162, Sept. 13, 2006). Anadarko takes the position that their failure to do so violated the Code of Ethics. (*Id*. at 49). It is clear, however, that the proposal did not develop because Bishop decided not to retire. There is no evidence in the record that Davis's and Molleston's work on the proposed transaction to acquire GeoSouthern interfered with the performance of their duties at Anadarko.

In the spring of 2005, Rawson pursued another potential transaction between GeoSouthern and Anadarko. This proposal involved GeoSouthern acquiring Anadarko's marginal wells, or "cats and dogs," in the Austin Chalk. (Rawson Dep. 168:1–17). Initially, Anadarko did not respond. In the spring of 2006, this proposal developed into a suggested property swap in which Anadarko would exchange certain marginal or nonperforming wells in the Austin Chalk for GeoSouthern's interests in Tyler County, Texas. Rawson met with Andrew Rudderow, Jerry Windlinger, and Dan Cook from Anadarko on March 21, 2006 to discuss this idea. Rudderow testified that Anadarko was not interested in selling assets to raise cash but that a property swap could be possible:

> Anadarko had a tremendous amount of cash to begin with.  We had sold off properties a year and half prior, $3 billion worth. We weren't looking for cash . . . . [I]f there was any discussion with Jeff Rawson at that lunch, that's what we would have told him was that we're probably more interested in swaps and trades than selling properties for cash.  We had plenty of cash.

(Prelim. Inj. Hr'g Tr. 57, Sept. 25, 2006).  Rawson testified that:

> Anadarko became so fond of [GeoSouthern's] Tyler County properties, they indicated to GeoSouthern they would definitely entertain a property swap.  GeoSouthern at an earlier time had tried to acquire the cats and dogs and made an offer, as I understand it, to buy them outright, that received no response to speak of; and then sometime later, the response came back that, well, we would entertain this if you're interested in swapping your Tyler County interest.

(Rawson Dep. 168:21–169:4).

In June 2006, Bishop recruited Molleston to work for GeoSouthern as its vice-president.  Bishop was preparing to retire and wanted to turn the day-to-day operations over to others.   Bishop offered Molleston a compensation package for a term of years that included an equity interest in deals she brought in.  Molleston credibly testified that when she left Anadarko, she took only personal files with her and did not take any Anadarko confidential or propriety information.

After Molleston went to GeoSouthern, discussions on the proposed swap continued. Rudderow testified that the discussions did not lead to a deal.  Rudderow testified that Anadarko did not follow through with the proposed trade because Anadarko had not had an opportunity to put together a list of wells that it would offer in the trade.  (Prelim. Inj. Hr'g Tr. 81, Sept. 25, 2006).

After she joined GeoSouthern, Molleston sought to hire other personnel.  She contacted Davis and offered him a similarly structured compensation package that included a portion of her equity payouts for deals that he helped close.  Davis's contract at GeoSouthern covered a three-year term at a base-compensation rate that was $10,000 per year less than he had made at Anadarko.  Because he was only two years away from retirement eligibility at Anadarko, he gave up nearly $625,000 in retirement benefits and another $130,000 worth of restricted stock.  Davis signed an employment contract with GeoSouthern on June 30, 2006 and turned in his resignation letter to Anadarko on the same day.  His last day of employment with Anadarko was July 14, 2006.

On June 23, 2006, just a week before Davis resigned from Anadarko, there was a public announcement of Anadarko's agreement to acquire the Kerr-McGee Corporation for approximately $16.4 billion and to acquire Western Gas Resources in a separate transaction for $4.7 billion.  Anadarko would assume approximately $2.2 billion in debt.  This announcement led to the assumption by those involved in the industry, including Molleston and Rawson, that Anadarko would be interested in selling assets to reduce the debt.  Rawson, Bishop, and Molleston decided that the timing was right for GeoSouthern to make an offer for all of Anadarko's Austin Chalk properties.  According to Rawson and Davis, the work previously done to evaluate those properties, including wells in which GeoSouthern and Anadarko held joint interests, was used to begin to put together the proposal.  Rawson and Davis testified that the work they had done in connection with the 2004 possibility of Molleston, Rawson, and Davis acquiring GeoSouthern, in connection with GeoSouthern's

12

2005 proposal to acquire Anadarko's marginal wells, and in connection with GeoSouthern's 2006 proposal to swap the marginal wells for GeoSouthern's Tyler County interests, all "morphed" into work on the proposal that GeoSouthern would acquire Anadarko's interests in the Austin Chalk.  Rawson approached Gessinger at GE about financing for this proposal.

Davis testified that he did not begin to work on this proposed acquisition by GeoSouthern until after July 14, 2006, when he began working there.  Anadarko disputes Davis's testimony.  It is undisputed that on August 28, 2006, GeoSouthern presented Anadarko with an offer dated August 18, 2006, proposing to purchase Anadarko's Central Texas properties for $750 million.

On June 28, 2006, Davis began downloading various files from Anadarko's system using USB thumb drives.  According to Davis, he attached a thumb drive to his desktop computer at Anadarko five or six times before he left.  He copied files he thought might be useful to him at GeoSouthern because he felt that GeoSouthern lacked many technological capabilities.  Davis testified that he did not stop to consider the impropriety of his actions. Among the files Davis downloaded was Anadarko's June 28, 2006 reserve report and approximately 75 images from Anadarko's RockPilot imaging program.  Davis also downloaded several folders from his Microsoft Office Outlook program at Anadarko that contained personal and business contacts and other information, some of which was related to Anadarko's operations.

Anadarko's computer analyst, Jeffrey Frank, testified that Davis downloaded 7.21 gigabytes of Anadarko data.  Frank estimated that 7.21 gigabytes of data is equivalent to 1.5

million pages of raw text. (Prelim. Inj. Hr'g Tr. 37–38, Sept. 20, 2006). Frank's forensic analysis revealed that two different thumb drives were used between June 28, 2006 and July 13, 2006; one was a generic "USB Disk Pro" thumb drive and the other a "SanDisk U3 Cruiser Micro." (*Id.* at 29–31). Davis testified that he only used one thumb drive to remove the information he took to GeoSouthern. Each time his thumb drive reached maximum capacity, Davis would transfer the contents to his personal laptop computer. He repeated this procedure five or six times. On July 14, 2006, when Davis officially began working at GeoSouthern, he transferred much of the information to his desktop computer at GeoSouthern and onto one of GeoSouthern's servers.

On July 21, 2006, Anadarko sent Bishop two letters addressing GeoSouthern's hiring of Davis and Molleston and their confidentiality obligations to Anadarko. (Pl. Exs. 28, 29). The letters pointed out that Davis and Molleston had ongoing duties to protect Anadarko's confidential information they acquired while they were Anadarko employees and asked GeoSouthern to use reasonable measures to ensure that such information was not used. Davis received a similar letter from Anadarko reminding him of his obligations to protect Anadarko's confidential and proprietary information and to comply with Anadarko's Code of Business Conduct and Ethics. The letter also asked that Davis "not undertake or accept job assignments or projects where [he] would be reasonably expected to utilize confidential or proprietary information of Anadarko." (Pl. Ex. 30).

### D.    The Evidence as to the Information Davis Took

Two categories of information Davis took from Anadarko are particularly sensitive. One is the June 28, 2006 reserve report for the Texas Gulf Coast Trend.  Reserve reports are updated quarterly.  The reserve report is Anadarko's internal assessment of the value of its wells.  Although some of the information contained in the report is available publicly and other information is shared with joint working-interest owners, much of the information is kept confidential within Anadarko.  Bradley Holly, an Anadarko development manager for the Austin Chalk, stated that Anadarko treats the reserve report as highly confidential for the following reasons:

- it lists Anadarko's interpreted Estimated Ultimate recovery (EUR) for each well at the end of 2005 and current estimate for 2006;

- the report contains the net remaining hydrocarbons for each well, which is the EUR minus what has been produced to date (Cumulative Production);

- the report takes the net remaining hydrocarbons and using a set oil and gas price (both listed on the report) it shows a BFIT (before federal income tax) Present Value, Anadarko's internal assessment of the value of its remaining reserves for each well; and

- the report lists Anadarko's reserve base in industry-defined reserve categories such as Proven Producing (PP), Proven Non-Producing (PN), and Proven Undeveloped (PU).

(Docket Entry No. 11, Ex. D at 2–3).  This information, according to Holly, provides Anadarko's analysis of the value of a particular well and the expected profitability of that well.  Holly stated that the information contained in the reserve report is highly confidential

and is not distributed outside Anadarko.  (Docket Entry No. 19, Ex. B at 3).  Holly testified that while some of the information used to prepare the reserve report is publicly available, that information is combined with internal, proprietary data, gathered at considerable time and expense, to create the report.  (Prelim. Inj. Hr'g Tr. 179, Sept. 20, 2006).  Holly explained that Anadarko does not provide its reserve report to its working interest partners:

> We would give the joint interest owners information like production.  We would give them information such as operating expenses.  We would not give them any – we would not give them any of the future projections on reserves.  We would not give them our internal price decks.  We would not give them – I can think of no instance where [we] would give them our net revenue interest.

(Prelim. Inj. Hr'g Tr. 178, Sept. 20, 2006).  Holly described why Anadarko did not disclose the reserve report even to joint working-interest owners:

> Q:    And why would you not share this information with your joint working interest owners?
>
> A:    Because even though your joint working interest owners like GeoSouthern and Anadarko have interest in the same well, there is always the ability for one of the partners to try to buy the other one out, or one of the partners sell to the other partner, or you could even trade properties.  And so, this information is kept very confidential, because each company has a different assessment.  And if you hired a third party, a third party would come up with a different assessment.   There is so many uncertainty nobs in a reserve report that each individual company or each individual entity that did a reserve report would obviously come up with different net remaining and a different present value.  It's a difference in perception on what the value remaining is.

> Q:     So, if GeoSouthern has this information from Anadarko's reserve report and they decide that they want to make a play for 1500 wells in the Giddings field, what advantage do they have over Anadarko, if any?
>
> A:     As has been stated earlier today, the S.E.C. reserve reporting is a very serious matter, and has to be accurate. And so, this is Anadarko's most accurate interpretation of what our value is in the field.  If any competitor had that data, in my mind it would eliminate any ability to buy, sell, or trade properties with that company, because they know all of your cards in your hand, and it's very hard to negotiate with somebody when they know what your internal value is for something.
>
>    . . . .
>
> Q:     So, it would make it impossible for you to ever get a premium on your property; is that right?
>
> A:     That's correct.  I mean, if I had – if I knew what the value, true value was for something, why would I overpay for that value?

(Prelim. Inj. Hr'g Tr. 182–83, Sept. 20, 2006).  Davis testified that he had not known Anadarko to give away a reserve report to a competitor and had not heard of any oil and gas company that had shared its reserve reports with a competitor.  (Davis Dep. 73:5–10).

The second category of confidential information is images from Anadarko's RockPilot program that contain geologic data and interpretations of that data.  Anadarko shares the raw geologic gamma ray data with other working-interest owners but does not share the images containing the interpretations of that data.

Anadarko introduced correspondence between it and another working-interest owner, Border to Border Exploration, L.L.C., to show the confidential nature of the RockPilot

17

program images.  (Pl. Ex. 26).  In the first letter, dated March 26, 2005, Border to Border's chief executive officer asked for the "horizontal well logs derived from directional data and gamma ray data," stating that this type of information was routinely provided to working-interest owners in all deals in which he had participated in the past 25 years.  In a response dated April 26, 2005, Anadarko stated that while it provides its working-interest owners with geologic prognosis data, daily drilling reports, and production data, it does not provide its working-interest owners with its "internal geologic interpretation of the MWD gamma ray (a/k/a "RockPilot Program")."  (*Id.*).  Anadarko explained that the data its working-interest owners receive provide enough information for those partners to create their own interpretations and to provide input to the well operators, but did not "jeopardize the confidentiality of our RockPilot Program, which we developed and paid for, and believe affords us a competitive advantage in horizontal drilling applications."  (*Id.*).

Davis stated in his deposition that the RockPilot images are not disclosed outside Anadarko.  (Davis Dep. 130:12–18).  When its working-interest partners have requested geological interpretations in the past, Anadarko has refused to provide such information.  (Pl. Ex. 26).  As Anadarko stated in the letter to Border to Border Exploration, "[w]e do not provide, or expect to receive from other companies, internally generated interpretations of the MWD data."  (*Id.*).

Anadarko's Geology and Geophysics Manager, Michael Hoffman, testified consistently.  (Docket Entry No. 19, Ex. A).  Hoffman stated that the interpretation of the

data obtained through gamma ray imaging is Anadarko's intellectual property and not shared with its competitors or working-interest partners:

> This information was obtained at great cost and expense to Anadarko. This information is extremely valuable because it provides an indication of whether oil and gas may be located in an area and provides information on drilling techniques and strategies that should be used to effectively explore for oil and gas in the Austin Chalk Trend. An oil and gas company in possession of such information gains a significant advantage in being able to evaluate and develop prospects.

(*Id.*). Hoffman also testified that creating a RockPilot image takes approximately 20 to 30 hours of interpretative work plus the cost of drilling the well. (Prelim. Inj. Hr'g Tr. 142–43, Sept. 20, 2006). The RockPilot images would be useful to a potential purchaser of Anadarko's properties by allowing it to maximize the production of those wells without having to spend the time and money to create similar imagery. (*Id.* at 146–47).

Anadarko has taken steps to protect the confidentiality of its reserve reports and the RockPilot program and images. Anadarko requires employees to use security cards to gain access to various parts of its facilities and limits access to databases that contain confidential information. Anadarko only provides access to its reserve report to certain individuals within the company. "It is confined to the Texas Gulf Coast Trend, which would be approximately 80 employees in the entire Anadarko company. . . . [The Reserve report is] very closely guarded." (*Id.* at 175).

Davis and GeoSouthern do not dispute the confidential and proprietary nature of much of what Davis took when he left Anadarko. The disputed issues are the extent to which

Davis used the information; whether it has all been returned; and whether Davis, Molleston, and GeoSouthern can be trusted to refrain from using it in the future.

### E.   Davis's Use of the Anadarko Information

Anadarko asserts that Davis and GeoSouthern used the information Davis took from Anadarko as part of the information provided to GE Energy Financial Services to obtain the financing for the August 28, 2006 offer to purchase Anadarko's Central Texas properties for $750 million.  (Pl. Ex. 32).  Davis responds that he only used one piece of information from the reserve report, which is of limited value, in writing his own reserve report in support of the proposed acquisition, and that neither he nor GeoSouthern made any other use of the information he took from Anadarko.

As part of the work on GeoSouthern's plan to propose a purchase of Anadarko's Central Texas properties, Davis was asked to put together a report of reserve  estimates for the Anadarko wells, which Rawson would provide to GE Energy Financial Services. (Prelim. Inj. Hr'g Tr. 124, Sept. 13, 2006).  The database Davis prepared included 1,135 wells identified as Anadarko operated wells.  The database did not include all the Anadarko wells in the Austin Chalk.  The report identified the wells; listed Anadarko's percentage of interest in each well; provided production information; provided certain assumed or generic data as to working and net revenues; provided assumed numbers for present worth; and projected reserve values.  Davis described this report as a "reserve economic projection model."  (Davis Dep. 79:6–14).

20

To prepare the reserve economic projection model in the short time available, Davis solicited help from a consultant with whom he had previously worked, William Daniel. Davis asked Daniel to create a database of Anadarko's Austin Chalk properties that Davis could use for his economic projection report.  Davis provided Daniel a computer disc containing an electronic copy of Anadarko's June 28, 2006 reserve report to assist him. (Davis Dep. 134:16–25).  Davis stated that he gave Daniel the Anadarko reserve report for a limited purpose:  to provide a list of Anadarko's wells and the amount of Anadarko's interest in the wells.  (Prelim. Inj. Hr'g Tr. 141, Sept. 13, 2006; Davis Dep. 78:18–79:19). Davis testified that he could have obtained much of this information from the public sources, although he could not have learned the percentage of Anadarko's interest in the wells it did not operate.  (Prelim. Inj. Hr'g Tr. 142, Sept. 13, 2006).  When Daniel returned the database to Davis, it not only had the well names but also the actual net revenue numbers for the wells. (Davis Dep. 79:15–19).  Davis testified that he "stripped all those out and put in generic and net revenue interest numbers," removing all information taken from the Anadarko reserve report except the well names and the amount of Anadarko's interest.

> The only thing that was used of that reserve report was to get the well count.  And when [Daniel] took – when he had the working and net revenue interests in there, I took those out and I put in generic, which I – you know, in the case, you know, variant which – which I knew somewhere in the ballpark of our interests were.
>
> I did not have operating expense numbers, didn't – didn't have product price differentials, didn't have a lot of the component parts.  So I had to come in and make a lot of basic assumptions.

(*Id.* at 85:5–15).  Davis testified  that he did not use Anadarko's reserve report values but instead used publicly available information and his own knowledge to arrive at assumed or generic values for operating expenses and discounts to present value and to estimate reserve values.  (*Id.* at 96:6–15).  Davis testified that he did not use Anadarko's reserve report projections but instead worked twenty hours a day from the time he left Anadarko until he provided his report to Rawson in summary form on August 8, 2006 to create his own database and establish his own projections using his own model.  (Davis Dep. 95:24–96:5). Davis ran out of time to complete his report; it was only partially finished when he gave it to Rawson.

The summary and report of economic projections that Davis gave to Rawson on August 8 included 1,135 wells and was 1,300 pages long. (D. Exs. 3, 4).  The report projected gross oil reserves, gross gas reserves, and net oil and gas reserves.  The report included an assumed or "generic" oil price and gas price; an assumed or "generic" oil and gas net revenue; an assumed or "generic" net cost; and an assumed present worth profile. (D. Ex. 4).  The summary stated that the database was still being developed.  The "PDP" portion remained to be completed and checked and the "PNP" and "PUD" categories had to be added.  (D. Ex. 3).

Davis credibly testified that he did not use the RockPilot images he took from Anadarko:

> Q:   Why did you download them?

22

A:     We have – originally, the way I – I was just going to use it to do the Fayette & Lee.  We have a lot of joint interest wells, and I wanted to look at – you know, it – to help in any type of joint cleanouts or workovers that we might have.  And the one in example right now that we're working on, that is the – the Hematite, which is a joint interest well.

Q:     But you're using Anadarko's information?

A:     No.  What I found is those folders, the – the Lee & Fayette, had none of the old wells in it.  They were all just some of the newer wells, and it was of no use to me.

Q:     Why would the newer wells be of no use to you?

A:     Because I was going to use it for – help me figure out where – cleanouts of existing wells.

Q:     Don't these JPEGs that you downloaded we see reflected here under No. 3 on Exhibit No. 1, don't those change – don't those reflect the interpretation –

A:     Yes.

Q:     – of those wells you – from the geosteering?

A:     Yes.

Q:     Then it's your testimony that none of these interpretations assist you in doing your job with GeoSouthern?

A:     They – the intent I had was to use them to help me determine how to best clean out or work over wells.  They did not meet that – they didn't help me.

(Davis Dep. 128:15–129:18).  Davis testified that he did not use and does not intend to use any of the information from Anadarko's RockPilot images.  (Prelim. Inj. Hr'g Tr. 118, Sept. 13, 2006).

Davis testified that he did not begin working on the report he prepared for Rawson until after he left Anadarko on July 14, 2006.  Anadarko asserts that Davis's testimony on this point is not credible.  Anadarko points to an email dated June 30, 2006 in which Rawson asked Bishop and Molleston whether Davis has "updated his data on the properties we want to purchase in our initial offer?  Remember Dick [Gessinger at GE Energy Financial Services] believes approval by his investment committee will be more forthcoming if our initial offer does not exceed $250 million." (Pl. Ex. 47).  Molleston replied on July 12, 2006: "Don is working on updating the offer.  It will take a few more days." (*Id.*).  Anadarko asserts that these emails reveal that Davis had in fact been working on the report before he began working at GeoSouthern on July 19, 2006.  Davis and GeoSouthern respond that the June 30, 2006 email referred to Davis's updating the analysis he had done as part of the earlier proposed transactions, before the idea for GeoSouthern's much larger offer to buy Anadarko's Austin Chalk properties.  Anadarko also asserts that Davis used the confidential and proprietary information he took from Anadarko to prepare the well evaluation given to GE Energy Financial Services in August 2006 for purposes beyond obtaining the list of the well names and Anadarko's interest in each.

After receiving Davis's incomplete valuation report, GE Energy Financial Services approved the financing for GeoSouthern's proposal for the purchase of Anadarko's Austin

Chalk properties.  Rawson testified that he conveyed to GE Bishop's and Davis's belief that there was "great PUD potential" in the properties and that GeoSouthern planned to develop them as support for making a  $750 million initial offer to Anadarko, rather than an earlier discussed price of $500 million.  "[PUD is] an estimate of what may be in place based on empirical data from the proved developed producing category of reserves from that same well or group of wells in a given province or region."  (Rawson Dep. 228:4–8).  Part of GeoSouthern's plan was to develop an intensive drilling and development program in which existing well bores would be redrilled, often horizontally on an existing vertical well.  "You enter an old well bore, pick out another level, try to find another producing horizon . . . and drill into that producing horizon, hopefully successfully . . . ."  (*Id.* at 229:21–25).

GeoSouthern delivered a letter dated August 18, 2006, offering to purchase Anadarko's Central Texas properties for $750 million, on August 28, 2006.  The letter proposed that GeoSouthern and Anadarko enter into confidential and exclusive negotiations.  (Pl. Ex. 32).  The letter made it clear that the $750 million was not a binding but only a preliminary offer.  "Based on the information available to us and with appropriate access to current information and full cooperation from Anadarko it would be reasonable to assume GeoSouthern and a subsidiary of [GE], as a limited partner in a to be formed private limited partnership, could present a purchase price offer of the magnitude mentioned above for your consideration."  (*Id.*).

GeoSouthern's purchase of Anadarko's Central Texas properties would have been GeoSouthern's single largest transaction.  (Prelim. Inj. Hr'g Tr. 122, Sept. 20, 2006).

25

GeoSouthern's well interests in that region would have gone from approximately 300 to more than 1,500.  Bishop would have received the first 200-percent return on the profits, after which Molleston was entitled to 50 percent of the profits, a percentage of which Davis would have received under his employment contract.

Anadarko did not respond to GeoSouthern's offer other than by sending letters demanding the preservation of documents and electronically stored information and by filing this lawsuit.

### F.     The Litigation and the Response

Anadarko filed this lawsuit on September 6, 2006.  On that same day, counsel for Anadarko sent a three-page letter to Bishop and Molleston, reminding them of their duties to preserve relevant documents and electronic information.  (Pl. Ex. 41).  The letter set out detailed instructions on the preservation of electronic files, email, internet activity, activity logs, supporting information, offline data storage, and physical documents.  The letter stated:

> Each of you has an obligation to preserve all digital or analog electronic files in electronic format, regardless of whether hard copies of the information exist.  This includes preserving:
>
> A.     active data (i.e., data immediately and easily accessible on your systems today);
>
> B.     archived data (i.e., data residing on backup tapes or other storage media); and
>
> C.     deleted data (i.e., data that has been deleted from a computer hard drive but is recoverable through computer forensic techniques).

(*Id.*).

On September 8, 2006, at his attorney's direction, Davis began a process of removing the information he had taken from Anadarko and downloaded to his own laptop, his GeoSouthern desktop, and the GeoSouthern server and providing a record of that information to Anadarko.  On advice of counsel, Davis deleted the Anadarko files from his laptop, his GeoSouthern desktop, and the GeoSouthern server.  At the same time, he copied the information he had taken back onto his thumb drive to return to Anadarko.  Jeffrey Frank, Anadarko's forensic computer analyst, testified that Davis returned only 1.14 gigabytes but that he had downloaded 7.21 gigabytes.  (Prelim. Inj. Hr'g Tr. 37–38, Sept. 20, 2006).  Davis testified that as he downloaded files from GeoSouthern's computers and his laptop to the thumb drive, he eliminated duplications, accounting for the difference.  (Davis Dep. 23:3–8).

After he copied each file over to the thumb drive, Davis deleted that file from the GeoSouthern computer and his own laptop.  Davis also created a list of documents he had taken from Anadarko.  (Pl. Ex. 45).  Davis's counsel produced this list to Anadarko along with the thumb drive containing the Anadarko information during the September 11, 2006 preliminary injunction hearing.  Davis also told his consultant, William Daniel, to destroy any copies he had of Anadarko's reserve report.  (Davis Dep. 134:6–15).  "I asked – called [Daniel] and I asked him to delete – delete and erase anything that had to do with that reserve report or any of the – any files or anything that would have been generated from that report." (*Id.* at 134:11–15).  Davis also asked Daniel whether he had shown this information to anyone and Daniel answered that he had not.  (*Id.* at 153:6–10).

Bishop, Molleston, and Rawson all credibly testified that they were unaware that Davis had taken confidential or proprietary information from Anadarko. Bishop testified that he never asked Davis whether he took anything from Anadarko and "wouldn't have approved of anything that was not legal." (Prelim. Inj. Hr'g Tr. 117, Sept. 20, 2006). Molleston assisted in drafting the August 18, 2006 offer letter and had lunch with Rudderow days before the letter's delivery to inform Anadarko of the impending offer. (Molleston Dep. 71:14–72:19). She testified that she was unaware that Davis had downloaded any confidential Anadarko information until she asked him about the allegations in this lawsuit. (*Id*. at 89:13–90:11). Rawson testified that he did not know and did not imagine that Davis would use improperly obtained information. (Rawson Dep. 235:6–236:11).

On September 20, 2006, the parties entered into the Agreed Order providing in part that Davis and GeoSouthern had to return all "data, electronic media of any kind, files, documents, technical data, and confidential data or proprietary data or information created by or belonging to Anadarko" and to "fully and completely account" for all such information that Davis took to GeoSouthern. Davis and GeoSouthern also agreed that they will make all of their computers and equipment available for reasonable inspection by Anadarko and its representatives. (Docket Entry No. 13). Both GeoSouthern and Anadarko have hired computer forensic experts to assist in auditing GeoSouthern's computers to be sure that no confidential or proprietary Anadarko information remains. That work is proceeding.

The Agreed Order effectively grants Anadarko much of the relief it requested. The remaining issues are whether Anadarko has made the necessary showing for a preliminary

28

injunction preventing Davis from working for any Anadarko competitor, including GeoSouthern; prohibiting GeoSouthern from employing Davis or Molleston; and granting Anadarko sanctions for spoliation.

## II.     The Preliminary Injunction Analysis

A court considers four factors in deciding whether to grant a preliminary injunction: whether the plaintiff is likely to prevail on the merits; whether the plaintiff will be irreparably harmed if the injunction does not issue; whether the defendant will be harmed if the injunction does issue; and whether the public interest will be served by the injunction. *ICEE Distribs., Inc. v. J & J Snack Foods Corp.*, 325 F.3d 586, 597 n.34 (5th Cir. 2003) (citations omitted).

### A.     Anadarko's Application for a Preliminary Injunction Prohibiting Davis from Competing with Anadarko

#### 1.     A Likelihood of Success on the Merits

Anadarko has shown that it is likely to succeed on its claim that Davis took confidential and proprietary information amounting to trade secrets.  "To state a claim for trade secret misappropriation under Texas law, a plaintiff must (1) establish that a trade secret existed; (2) demonstrate that the trade secret was acquired by the defendant through a breach of a confidential relationship or discovered by improper means; and (3) show that the defendant used the trade secret without authorization from the plaintiff." *Gen. Univ. Sys., Inc. v. HAL, Inc.*, 379 F.3d 131, 149–50 (5th Cir. 2004).  The Texas Supreme Court has stated that "a trade secret is any formula, pattern, device or compilation of information which

is used in one's business and presents an opportunity to obtain an advantage over competitors who do not know or use it." *In re Bass*, 113 S.W.3d 735, 739 (Tex. 2003) (quoting *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 918 S.W.2d 453, 455 (Tex. 1994)).  To determine whether there is a trade secret protected from disclosure or use, a court must examine six "relevant but nonexclusive" criteria: "(1) the extent to which the information is known outside the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken to safeguard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others." *Gen. Univ. Sys.*, 379 F.3d at 150 (citing *In re Bass*, 113 S.W.3d at 739–40); *see also Computer Assocs. Int'l, Inc.*, 918 S.W.2d at 455; *T-N-T Motorsports, Inc. v. Hennessey Motorsports, Inc.*, 965 S.W.2d 18, 22 (Tex. App.—Houston [1st Dist.] 1998, pet. dism'd).  The party claiming a trade secret need not satisfy all six factors "'because trade secrets do not fit neatly into each factor every time.'" *Gen. Univ. Sys.*, 379 F.3d at 150 (citing *In re Bass*, 113 S.W.3d at 740).

### a.     The Existence of a Trade Secret

At the preliminary injunction stage, "the trial court . . . determines whether the applicant [for preliminary injunction] has established that the information is entitled to trade secret protection until a trial on the merits." *Fox v. Tropical Warehouses, Inc.*, 121 S.W.3d 853, 858 (Tex. App.—Forth Worth 2004, no pet.).  A preliminary injunction applicant meets its burden by showing a probability of success in proving that its confidential information is

entitled to trade secret protection. *Mabrey v. SandStream, Inc.*, 124 S.W.3d 302, 311 & n.21 (Tex. App.—Fort Worth 2003, no pet.).

This court finds that the reserve reports and the RockPilot images that Davis downloaded and took to GeoSouthern were confidential and proprietary information. Anadarko has demonstrated that it took considerable effort to keep this material from competitors, including joint working-interest owners, an important indicator that trade secret protection applies. *Gonzales v. Zamora*, 791 S.W.2d 258, 265 (Tex. App.—Corpus Christi 1990, no writ); *Furr's, Inc. v. United Specialty Advertising Co.*, 385 S.W.2d 456, 459 (Tex. App.—El Paso 1964, writ ref'd n.r.e.), *cert. denied*, 382 U.S. 824 (1964). Anadarko has also presented evidence that although some of the information is publically available, the reserve reports and the RockPilot images include analysis and projections that are based on work done at Anadarko, at considerable effort and great expense. Anadarko has also shown that its reserve report and RockPilot images could be valuable to competitors. Several Texas cases hold that accumulations of future production estimates are trade secrets. *In re Desa Heating, L.L.C.*, No. 2-06-088-CV, 2006 WL 1713489, at *2 (Tex. App.—Fort Worth June 22, 2006, orig. proceeding) (mem. op.) (holding that release of financial information would allow customers to renegotiate their prices and competitors to undercut their pricing strategy); *Enron Oil & Gas Co. v. Flores*, 810 S.W.2d 408, 413–16 (Tex. App.—San Antonio 1991, orig. proceeding) (affording trade secret protection to a reservoir study that calculates and projects the amount of natural gas remaining in particular reserves).

Anadarko's RockPilot images are also the type of data protected under Texas trade secret law.  In *In re Bass*, 113 S.W.3d 735, 740 (Tex. 2003), a nonparticipating royalty interest owner sought discovery of a mineral estate owner's geological data.  The Texas Supreme Court noted that "the oil and gas industry typically treats seismic and other methods for obtaining subsurface geological information as trade secrets."  *Id.*  After noting that several other jurisdictions afford seismic data trade secret protection and applying the six-factor balancing test, the court applied trade secret protection to the data in that case.

This court finds that Anadarko has shown a probability of success in proving that its reserve report and RockPilot images are entitled to trade secret protection.[2]

###### b.    *Acquisition Through Improper Means*

Davis does not dispute that he acquired Anadarko's confidential and proprietary information without authorization, in violation of the company's Code of Ethics, and in violation of the duty he owed his employer under Texas law.  Davis did not have Anadarko's permission to download any of the information he took to GeoSouthern when he left

---

[2]  GeoSouthern and Davis argue that an earlier disclosure of geosteering software by Anadarko's predecessor, Union Pacific Resources Company, resulted in the loss of any potential trade secret protection to Anadarko for its RockPilot images.  (Docket Entry No. 36 at 3 n.1).  Two of Union Pacific's former employees took Union Pacific's patented "GR-Nav" program when they left to form their own company.  Union Pacific ultimately lost its trade secret lawsuits against those employees.  *See Union Pac. Res. Co. v. Chesapeake Energy Corp.*, 236 F.3d 684 (Fed. Cir. 2001); *Union Pac. Res. Co. v. Chesapeake Energy Corp.*, No. Civ. A. 4:96cv726Y, 1999 WL 33268422 (N.D. Tex. Sept. 21, 1999); *Union Pac. Res. Co. v. Chesapeake Energy Corp.*, No. Civ. A. 4:96cv726Y, 1998 WL 34359124 (N.D. Tex. May 20, 1998); *Union Pac. Res. Co. v. Chesapeake Energy Corp.*, No. Civ. A. 4:96cv726Y, 1998 WL 34359125 (N.D. Tex. May 20, 1998).  The record shows that the GR-Nav program is a different program than Anadarko's current RockPilot program.  Moreover, Anadarko's claim is not merely that the RockPilot program is protected, but rather that the specific images generated using that program contain the confidential and proprietary interpretation, and that Davis took a number of images when he left Anadarko.

Anadarko.  Davis has admitted that he should not have taken the information.  "Yes, [Anadarko's Reserve Report] contains confidential information. . . . When I downloaded it, I didn't think about it.  When I – now, in retrospect, yes, ma'am, I – I should have been thinking that it's something I should not have taken."  (Prelim. Inj. Hr'g Tr. 40, Sept. 13, 2006).  As noted, the Agreed Order requires the return of the confidential and proprietary data and information that Davis took.  (Docket Entry No. 13).

*c.    Unauthorized Use*

Texas courts recognize that an employee owes a duty to his employer not to use confidential or proprietary information acquired during the employment relationship in a manner adverse to the employer, regardless of whether a noncompetition agreement is in place.  *T-N-T Motorsports, Inc.*, 965 S.W.2d at 21–22; *Miller Paper Co. v. Roberts Paper Co.*, 901 S.W.2d 593, 600 (Tex. App.—Amarillo 1995, no writ).  This duty extends beyond the employment relationship and prevents the former employee from using confidential information or trade secrets acquired during the course of employment to disadvantage the former employer.  *T-N-T Motorsports, Inc.*, 965 S.W.2d at 22; *Miller Paper Co.*, 901 S.W.2d at 600–01.  "Even in the absence of an enforceable nondisclosure agreement, a former employee may not use confidential information or trade secrets the employee learned in the course of his employment for his own advantage and to the detriment of his employer."  *Fox v. Tropical Warehouses, Inc.*, 121 S.W.3d 853, 858 (Tex. App.—Fort Worth 2004, no pet.); *see also Rugen v. Interactive Bus. Sys., Inc.*, 864 S.W.2d 548, 551–52 (Tex. App.—Dallas 1993, no writ) (affirming an injunction against a former employee preventing the use of

33

confidential or proprietary information even though a noncompete agreement was unenforceable).  The duty does not, however, prevent an employee from using his general knowledge, skill, and experience to compete with a former employer.  *T-N-T Motorsports, Inc.*, 965 S.W.2d at 22.

Anadarko has not presented evidence showing that Davis or GeoSouthern used the RockPilot images to prepare the August 28, 2006 offer or for another purpose.  Davis admittedly used the Anadarko reserve report in preparing his own August 8, 2006 report.  Anadarko has not presented evidence showing that Davis or GeoSouthern has otherwise disclosed or used the reserve report or other information Davis took when he left Anadarko. The critical disputes are whether Davis used the reserve report in preparing his own evaluation of the Anadarko Central Texas properties beyond identifying the list of wells and Anadarko's interest in them, as Davis testified, and whether there is a likelihood that despite the Agreed Order already in place, Davis and GeoSouthern will use Anadarko's confidential or proprietary information in the future.

Anadarko asserts that Davis could not have prepared the report he gave Rawson as quickly as he did without using extensive data from Anadarko's reserve report.  Holly provided the following testimony:

> Q:  So, what we see here is in less than two weeks, [Davis] put together a draft of the report on which GE Capital committed ultimately to $750 million financing.  Is that right?
>
> A:  Yes.

34

Q:    Now, if Mr. Davis did not use Anadarko's reserve report and didn't use Anadarko's PI/Dwight's downloads and didn't have that available at GeoSouthern and didn't have another petroleum engineer working with him and didn't have a technical assistant, how likely do you think it would be he can put this together in that period of time?

A:    I would say that would be highly unlikely.

Q:    And, in fact, if you had two engineers working on it full time and they weren't having to run drilling rigs and handle Mr. Davis's existing business and handle field problems, two of them working full time on this for two weeks, it would come out to about 160 hours?

A:    Somewhere like that.

Q:    They would have technicians helping them, right?

A:    Correct.

Q:    So, they could probably do it in about two weeks?

A:    That's my estimate.

(Prelim. Inj. Hr'g Tr. 220, Sept. 20, 2006).  Holly also testified that in his experience, a financing company like GE Energy Financial Services would not have committed $750 million based on the data that Davis provided but would have required more information to arrive at a figure that large.  (*Id.* at 231).

Davis and GeoSouthern respond by emphasizing that Davis did not do all the work in his report from scratch beginning on July 19, 2006.  Davis had created a model for analyzing reserves before he got the specific assignment to put together the data for GeoSouthern's proposal to acquire Anadarko's Austin Chalk properties.  (Prelim. Inj. Hr'g

Tr. 166, Sept. 13, 2006).  Davis had previously looked at information about GeoSouthern's wells, including the wells in which Anadarko had an interest, when he was working on the proposal to acquire that company.  GeoSouthern had a significant amount of information relating to wells in which it had a joint interest with Anadarko.  Some work had been done on Anadarko's "cats and dogs" marginal wells in connection with the proposal to have GeoSouthern acquire those marginal wells and then to swap them for GeoSouthern's Tyler County properties.

It is unclear whether and to what extent Davis began working on the proposed GeoSouthern acquisition of Anadarko's Central Texas properties before he left Anadarko. The evidence is clear that the idea that led to GeoSouthern's proposal to acquire Anadarko's Central Texas interests did not even exist before June 23, 2006, when Anadarko's acquisition of Kerr-McGee and Western Gas was announced.  Davis was not included in the email exchanges that were taking place among Rawson at Merrick Capital, Molleston at GeoSouthern, and Gessinger at GE Energy Financial Services in late June 2006.  (Pl. Ex. 47). During the two-week period between Davis submitting his resignation to Anadarko and his actual departure, the discussions among Rawson, Molleston, and Gessinger related to the evolution of the smaller earlier proposals to acquire some of Anadarko's interests in the Central Texas area to the larger proposal to acquire all of Anadarko's Central Texas properties.  Davis was not involved in these discussions.  Davis testified that he did not receive the assignment to create the economic report until after he arrived at GeoSouthern. (Prelim. Inj. Hr'g Tr. 106, Sept. 13, 2006).  Rawson testified that he asked Davis to provide

36

a list of properties that Anadarko owned in the area and asked both Davis and Ward Mustin at GeoSouthern to gather public information from sources such as the Railroad Commission and Dwight's, but Rawson could not recall whether he asked Davis to do this before Davis left Anadarko.  (Rawson Dep. 57:11–60:17).

The emails and testimony show that before Davis left Anadarko, he was gathering and updating information he had previously developed in connection with the smaller GeoSouthern related proposals he had worked on.  The record does not support a finding that Davis lied when he testified that he did not begin working on the actual report provided to Rawson until after he left Anadarko.  (Prelim. Inj. Hr'g Tr. 106, Sept. 13, 2006).  No evidence shows that until Davis actually left Anadarko, he received the specific assignment to write a reserve analysis for GeoSouthern's proposal to acquire Anadarko's Central Texas properties.  The evidence does show that in the two weeks after he submitted his resignation letter, before he left Anadarko, Davis was working on "updating" information that he was able to use when he received the assignment for the report on the larger proposed offer.  Because the evidence shows that Davis was building on and adding to information that he previously had available, the evidence does not compel this court to conclude, as Anadarko argues, that Davis began to use information from Anadarko's reserve report before he left Anadarko or that he used more information from the reserve report than the list of wells and the amount of Anadarko's interest to prepare the report in the short time available.

Davis's testimony as to his limited use of Anadarko's reserve report information to prepare his own report is supported by the fact that his report does not contain information

from the Anadarko reserve report other than the list of wells and the amount of Anadarko's

interest in each.  Holly testified on cross-examination that GeoSouthern's $750 million

valuation of Anadarko's Central Texas properties was less than the value that Anadarko's

reserve report placed on those properties.  (Prelim. Inj. Hr'g Tr. 246, Sept. 20, 2006).  Holly

was specifically asked about a comparison between the Anadarko reserve report and the

Davis report:

> Q:   Did you compare the reserve numbers for gas and oil that
> are in Anadarko's internal reserve report with what was
> in Exhibit 50 [Davis's report to GE Energy Financial
> Services]?
>
> A:   I did.
>
> Q:   Did they match?
>
> A:   No, sir.  They did not.
>
> Q:   They didn't.  Did you compare the prices?
>
> A:   I'm sorry.  What prices?
>
> Q:   The $5.50 gas price and the $55 oil price?
>
> A:   I did.
>
> Q:   And that's not what Anadarko uses, is it?
>
> A:   The Anadarko value there will, for the S.E.C. value used,
> the last price on the last day of the quarter, and so that
> Anadarko's price would change.  You know, that's just
> a static price that we use on the last day of the quarter.
> So, that would be the prices as of March 31st on that
> report.

> Q:     I understand.  But as of the reserve report that these lawyers allege that Mr. Davis used, the prices are different, aren't they?
>
> A:     The prices on Anadarko's report are different than the prices in this report, that's correct.

(*Id.* at 248–49).  Allen Sanders also testified that he did not find any confidential Anadarko information in the report Davis gave to Rawson.  (Docket Entry No. 36, Ex. C at 16–25).

Davis's testimony is also consistent with Rawson's testimony about what he asked Davis to provide.  Rawson testified that after June 23, 2006, he talked to Davis and another individual at GeoSouthern, Ward Mustin, about gathering information to present to GE Energy Financial Services.  Most of the information Rawson talked to them about gathering was publicly available.  One category of public information that Davis and Mustin were gathering consisted of P1s and P2s, which Rawson described as "well records, kept in Austin, the Railroad Commission, on all the wells in the state of Texas, . . . it's production history . . . to arrive at a kind of ballpark value for a given well based on some assumed price deck for oil and gas."  (Rawson Dep. 43:2–7).  A second category consisted of information available through Dwight's, which Rawson described as "a service that provides production data on a consolidated basis."  (*Id.* at 54:6–7).  Rawson also asked Davis for a third category of information, which was not available to the public.  Rawson needed to know what interests Anadarko had in wells beyond those jointly owned with GeoSouthern.  Davis agreed to attempt to assemble a list of the Anadarko wells.  (*Id.* at 59:9–60:17).  Davis used the

Anadarko reserve report obtain the information that Rawson had requested.  (Prelim. Inj. Hr'g Tr. 51–52, Sept. 13, 2006).

Although Davis faced enormous time pressures in completing his economic summary, and although he testified that he had not realized the mistake he made in copying the Anadarko reserve report information until after he had used part of it, this court finds Davis's testimony that he limited his use of the Anadarko report to the list of well names and the amount of Anadarko's interest in each well to be credible.  Davis used the Anadarko report to obtain information Rawson asked him to get, faster and in more detail than the public records could provide.  Beyond the list of well names and the amount of Anadarko's interest, however, Davis credibly testified that he wanted the database and the economic summary to be his own work.  (Prelim. Inj. Hr'g Tr. 51–52, Sept. 13, 2006).  This testimony is consistent with the evidence that Davis did not use the assumed or "generic" numbers in the Anadarko report, instead using numbers that he believed to be more accurate.  This testimony is also consistent with that of the Anadarko witnesses who compared the contents of the Anadarko reserve report with Davis's report and the values reported.  The Anadarko witnesses found no information on the Davis economic report taken from the Anadarko reserve report besides the Anadarko well names and the amount of Anadarko's interest, and the results Davis reached were different than the Anadarko reserve report values.  (Docket Entry No. 36, Ex. C at 16–25).  Davis's testimony is also consistent with Rawson's testimony about what specific information he asked Davis to provide.  Finally, this testimony is consistent with Davis's testimony about his belief that his work was more reliable than Anadarko's and his

desire to have his own work and competence recognized.  The record does not reveal that Davis used information from the Anadarko reserve report other than the list of well names and the amount of Anadarko's interest in the wells.

Anadarko's argument that there had to be more information available to GE Energy Financial Services than the Davis economic summary to support the $750 million offer does not lead to the conclusion that Davis used Anadarko's reserve report or other confidential, proprietary information for a purpose beyond obtaining the list of well names and the amount of Anadarko's interest in the wells.  Rawson testified that he sent GE Energy Financial Services the economic report that Davis provided to him.  GE did its own analysis and arrived at the $750 million figure as a "very, very rough number."  Rawson explained that "[t]here's no way to get precise based on the modicum of information that was provided, which is why the letter of August 18th invites disclosure and a negotiation.  We really don't have sufficient data to even come close to an accurate number."  (Rawson Dep. 79:3–7).  Rawson also relied on statements by both Davis and Bishop that they believed the Central Texas properties had "good PUD potential."  (Rawson Dep. 226:2–228:11).  Anadarko asserts that the PUD figures in Anadarko's reserve report were the likely source of their evaluations.  The record does not support this argument.  Davis did not include PUD figures in his report.  Instead, he noted that this was one way in which the report was incomplete.  There is no indication that Bishop or Davis gave Rawson specific PUD values.  Instead, Rawson understood that their statements amounted to a "hip shooting" statement of potential

41

for the properties, based on long experience working in the Austin Chalk area. (Rawson Dep. 226:16–18).

The record shows that Davis did use confidential, proprietary information that he took from Anadarko in preparing the economic summary that he gave Rawson on August 8, 2006. The record does not show, however, that Davis used information beyond the list of the well names and the amount of Anadarko's interest in each well. Davis's testimony as to his use of the report is credible.

### 2. *Irreparable Harm to Anadarko*

A party can show a likelihood of suffering irreparable harm if the harm cannot be redressed by money damages. *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981). Anadarko points to the testimony of Michael Hoffman, Anadarko's Geology and Geophysics Manager, in support of its position that a broad injunction is required:

> Q:   What would be the impact on Anadarko's operations or its ability to buy, sell, or trade properties in the Austin Chalk if its RockPilot images for this area were out and known to the public or known within the industry?
>
> A:   The impact is kind of hard to estimate. It's kind of vague. It could be very large. I can think of many instances, such as if a company were trying to buy or trade properties with Anadarko, it's like them seeing all of your cards. Your interpretation is there, and they can get a much more thorough sense of how you may value that property; therefore, they can get a, perhaps, reduced or increased value of what they want to offer you for those properties.

. . . .

> Q:     Mr. Hoffman, if you could, could you sum up for us what
> is the value of the combination of the reserve report
> information, the RockPilot images, along with the files
> and other data reflected in Exhibit 42?  What is the value
> of information of this type to a company like Anadarko?
>
> A:     That value is hard to ascertain.  It could be very large.  I
> don't think there is an actual number you can put on that.
> I think it's [sic] could be enormous.
>
> Q:     Fair to say priceless?
>
> A:     That might be one way to put it, yeah.

(Prelim. Inj. Hr'g Tr. 145–47, Sept. 20, 2006).  Similarly, Bradley Holly, Anadarko's

Development Manager for the Austin Chalk, testified that if a competitor had Anadarko's

internal valuations of its properties, Anadarko could not "get a premium" price if it was

attempting to sell to that competitor:  "[I]f I knew what the value, true value was for

something, why would I overpay for that value?"  (*Id.* at 182–83).

Anadarko has shown that it is exposed to injury of a nature that would support an

injunction prohibiting the disclosure and use of its confidential and proprietary information.

The issue is whether Anadarko has shown that the Agreed Order already in place is

inadequate and that Anadarko will suffer irreparable harm unless a broader injunction

prohibiting Davis from working for any competitor and prohibiting GeoSouthern from

employing Molleston is entered.

Anadarko argues that its request for broader injunctive relief should be granted

because Davis cannot be trusted to refrain from using Anadarko's proprietary information.

(Docket Entry No. 38 at 16; Docket Entry No. 40 at 1–2).  Anadarko argues that Davis lied when he testified that he did not use the information he took from Anadarko except to generate the list of well names with Anadarko's interest in each; that he did not begin working on his economic report until after he was at GeoSouthern; and that he has returned all the information he took from Anadarko.  Anadarko asks this court to find that Davis lied when he testified that he has returned all of Anadarko's confidential and proprietary information and will not use it in the future.

Davis and GeoSouthern respond that the Agreed Order requiring that they return all of Anadarko's wrongfully acquired information and not use any of Anadarko's confidential or proprietary information provides adequate protection and that enjoining Davis from working for any competitor and enjoining GeoSouthern from employing Davis and Molleston is overly broad and effectively turns the nondisclosure obligation into a prohibition on competition.

This court has found credible Davis's testimony that he limited his use of the protected Anadarko information he wrongfully took to identifying Anadarko's Central Texas properties.  This court has not found that Davis lied when he testified that he did not begin work on the actual economic report until he had left Anadarko.  The record shows that Davis has returned a large amount of information that he took from Anadarko and that he and GeoSouthern have taken extensive steps to remove that information from his and GeoSouthern's computers, although the forensic examination necessary to verify that all the information has been returned to Anadarko is continuing.

Texas cases support limiting the preliminary injunction to the Agreed Order that is already in place. In *T-N-T Motorsports*, the defendants had worked for Hennessey Motorsports before opening their own business. *T-N-T Motorsports, Inc. v. Hennessey Motorsports, Inc.*, 965 S.W.2d 18, 22 (Tex. App.—Houston [1st Dist.] 1998, pet. dism'd). Hennessey Motorsports provided high-performance upgrades for a variety of automobiles. During their time with Hennessey, the defendants had acquired confidential information about Hennessey's services and used that information to open their own body shop, in direct competition with Hennessey. *Id.* at 20. The record showed that the defendants used the same products and vendors as Hennessey, planned to perform the same tests, offered an identical warranty on their cars, and used the same type of equipment that Hennessey used. *Id.* at 21. Within weeks of leaving Hennessey, at least three of Hennessey's customers had moved their business to the defendants' new shop. *Id.* at 20–21. The trial court issued an injunction prohibiting the defendants from: "directly or indirectly disclosing, using, selling or testing, for any purpose, (or imparting to any other person, firm, corporation, or other entity) *any information* relating to the Dodge Viper GTS, Dodge Viper Roadster or Mitsubishi 3000 GT motor vehicles; and working on, designing, repairing, installing, testing, soliciting, contacting, accepting any business from and/or providing *any types of services* on any Dodge Viper GTS, Dodge Viper Roadster or Mitsubishi 3000 GT motor vehicles . . . ." *Id.* at 25. On appeal, the defendants argued that the trial court's injunction was overly broad. The appellate court noted that Hennessey had shown that "[t]he only effective relief available . . . is to restrain the defendants' use of its trade secrets and confidential information

pending trial." *Id.* at 24. But the court agreed that the injunction was overly broad. It amended the injunction to prohibit the defendants from "directly or indirectly disclosing . . . any *Hennessey Trade Secret* information" and from "working on . . . and/or providing any types of services *using Hennessey Trade Secret information*." *Id.* at 26. The amended injunction did not prohibit the defendants from competing with Hennessey Motorsports or from working for any Hennessey competitor. The injunction was limited to preventing the use or disclosure of any Hennessey trade secret.

In *Rugen v. Interactive Business Systems, Inc.*, a Texas appellate court upheld a temporary injunction prohibiting a former employee from "calling on, soliciting, or transacting business with consultants employed or retained by IBS or customers of IBS until final judgment is rendered and entered." 864 S.W.2d 548, 550 (Tex. App.—Dallas 1993, no writ). IBS was a personnel company that provided computer consulting services; the defendant was an IBS employee working as an account manager in the Dallas, Texas office. The defendant resigned in 1990 and started her own firm, in competition with IBS. Shortly after she resigned, IBS noticed that some of its documents were missing from its Dallas office. IBS filed suit alleging that the defendant had breached a noncompete agreement and misappropriated trade secrets. IBS sought an injunction to prevent the defendant from working for any IBS competitor. The trial court found that even though the noncompete agreement was void, the defendant had confidential IBS information that deserved protection. *Id.* The trial court entered a temporary injunction prohibiting the defendant from calling on, soliciting, or transacting business with consultants retained by IBS or with IBS customers.

The appellate court upheld the injunction because it did not prevent the defendant from working in competition with IBS, but only prohibited her from soliciting or transacting business with IBS's consultants and customers whose identities she obtained from IBS's confidential information. *Id.* at 551.

Similarly, in *Southwest Research Institute v. Keraplast Technologies, Ltd.*, 103 S.W.3d 478, 480–81 (Tex. App.—San Antonio 2003, no pet.), the court entered an injunction prohibiting the defendants from any discussion involving or relating to the plaintiff's protected technology. The appeals court noted that injunctions involving trade secrets must be narrowly tailored to prevent the improper use of confidential or proprietary information but not "prohibit the enjoyment of lawful rights." *Id.* at 482 (internal quotation marks omitted). That court found that the injunction was overly broad because it contained such a broad definition of the plaintiff's technology that it "effectively prohibited [defendants] from carrying on or even discussing any . . . [similar] research . . . . Applied literally, the injunctions would prevent [defendants] from researching or discussing even . . . public information." *Id.*

In *Gonzales v. Zamora*, 791 S.W.2d 258, 268 (Tex. App.—Corpus Christi 1990, no writ), the appellate court modified an injunction prohibiting former employees from competing with their former employer to restrain only the use or disclosure of confidential and trade secret information. *Id.* at 262. The appellate court limited the injunction to prohibiting only the use or disclosure of trade secret and confidential information, rather than all information acquired during the former employment. The appellate court stated that

47

although trade secrets had been misappropriated, "[a]n employer is not entitled to an injunction preventing a former employee from soliciting employer's clientele as it existed on the day of employee's termination of employment, where there is no agreement not to compete." *Id.* at 268 (citing *Hart v. McCormack*, 746 S.W.2d 330 (Tex. App.—Beaumont 1988, writ. dism'd w.o.j.)).  The court deleted that part of the injunction "because it is an infringement of the right of [the former employees] to compete." *Id.*

In *Miller Paper Co. v. Roberts Paper Co.*, 901 S.W.2d 593, 597 (Tex. App.—Amarillo 1995, no writ), employees of Roberts Paper Company, which sold and distributed paper, janitorial, and chemical products, left the company to form a competing business and began soliciting Roberts's clients.  The Texas appellate court held that the trial court properly enjoined the defendants' use of any of the documents, records, and files they took from Roberts Paper, including  customers' names, addresses, billing information, and other confidential  customer information.  *Id.* at 601.  The appellate court noted that the injunction was proper because there was no noncompete agreement; the defendants were free to compete as long as they did not use or disclose their former employer's confidential information. *Id.*; *see also Variable Annuity Life Ins. Co. v. Miller*, No. 07-01-0117-CV, 2001 WL 1598331 (Tex. App.—Amarillo Dec. 14, 2001, no pet.) (unpub. opinion) (holding that an injunction prohibiting competition absent a valid noncompete agreement was overbroad given that an order was in place prohibiting use or disclosure of the former employer's trade secrets).

Under the Texas case law, when a former employee misappropriates his employer's trade secrets, the appropriate remedy is to enjoin use and disclosure of those secrets, not to enjoin work in competition with the former employer. *See, e.g.*, *S.W. Research Inst.*, 103 S.W.3d at 482. Anadarko has not shown that it will suffer irreparable harm of a nature that supports a broader injunction than is already in place.

### 3. *The Harm to Davis*

Enjoining Davis from working for any Anadarko competitor effectively prohibits him from earning a living in the industry in which he has worked for nearly thirty years. Anadarko is the single largest oil and gas interest owner in the Austin Chalk, the area where Davis has worked. Anadarko's recent acquisitions have made it the largest independent oil and gas exploration and production company. Precluding Davis from working for any competitor of Anadarko is tantamount to precluding him from working for any employer who would be likely to hire him. The balance of harm weighs heavily in favor of denying Anadarko's requested relief.

### 4. *The Public Interest*

Anadarko has obtained an order protecting its confidential and proprietary information. The present record does not support a finding that the public interest is served by further restrictions on Davis and GeoSouthern. Anadarko argues that allowing Davis to continue to work in the industry, in competition with Anadarko, would "reward" Davis for the misappropriation and breach of duties owing to Anadarko that this court has found. (Docket Entry No. 38 at 24). The Agreed Order already in place prohibits Davis and

GeoSouthern from using or disclosing Anadarko's confidential and proprietary information and allows Anadarko access to GeoSouthern's and Davis's computer systems to verify that all the information has been returned and removed, with contempt sanctions available for any violations.  Both Anadarko's and the public's interests are sufficiently served by the order this court has already issued.

*5.    Conclusion*

This court finds that Anadarko has not met the requirements for a preliminary injunction that prohibits Davis from working for GeoSouthern or any Anadarko competitor.

**B.     Anadarko's Application for a Preliminary Injunction Prohibiting GeoSouthern's Employment of Molleston**

Anadarko asserts that Molleston "knew that Davis was working on the analysis of Anadarko's properties for GeoSouthern while still employed by Anadarko."  (Docket Entry No. 38 at 18).  Anadarko points to the July 12, 2006 email from Molleston to Rawson, two days before Davis left Anadarko's employment, in which she states that Davis is "working on updating the offer."  (Pl. Ex. 47).  Anadarko claims that Molleston encouraged Davis to breach his fiduciary obligations to Anadarko, encouragement that was "the focal point of GeoSouthern's wrongful conduct."  (Docket Entry No. 38 at 18).

Anadarko does not allege that Molleston improperly acquired or used confidential or proprietary Anadarko information herself; the record shows no evidence that she did.  Nor does Anadarko allege that Molleston knew that Davis had taken Anadarko's information before this suit was filed.  Again, the record shows no evidence that Molleston (or anyone

50

else at GeoSouthern) was aware that Davis had downloaded and transferred Anadarko's confidential or proprietary information to GeoSouthern. Molleston credibly testified that she was unaware that Davis had taken Anadarko's files until Davis told her what he had done the day after this lawsuit was filed. (Molleston Dep. 89:13–90:11).

The record does not support a finding that before Davis left Anadarko on July 14, 2006, Molleston directed him to obtain information that was confidential or proprietary and use it to prepare GeoSouthern's offer to acquire Anadarko's Central Texas properties. The evidence does show that Rawson—not Molleston—asked Davis to put together a list of Anadarko properties, although it is not clear whether that occurred before or after July 14, 2006. The evidence also shows that Davis's work included updating information on GeoSouthern wells that Anadarko jointly owned or operated. There is no factual basis for a finding that Molleston encouraged Davis to violate his fiduciary duties to Anadarko or to misappropriate its confidential or proprietary information. There is no legal basis to enjoin a company from employing an individual who allegedly aided the misappropriation of another company's trade secrets by soliciting work from an employee of that other company when that person was unaware that the work involved misappropriated trade secrets.

A third party, such as GeoSouthern or Molleston, can be enjoined for knowingly aiding another's breach of fiduciary obligations. *See Mabrey v. SandStream, Inc.*, 124 S.W.3d 302, 315–17 (Tex. App.—Fort Worth 2003, no pet.); *ELCOR Chemical Corp. v. Agri-Sul, Inc.*, 494 S.W.2d 204, 212 (Tex. App.—Dallas 1973, writ ref'd n.r.e.). Even in these cases, however, the relief is limited to that necessary to protect against the use of

51

confidential or proprietary information.  In *Mabrey*, SandStream, Inc.'s engineering team worked for over four years to develop new technology that would combine various computer- and entertainment-related services, such as digital television and high-speed internet, in one package.  *Mabrey*, 124 S.W.3d at 307.  The defendant, Jim Mabrey, developed planned-residential communities.  In January 2002, Mabrey contacted SandStream to discuss using SandStream's technological services in a planned community.  *Id.* at 307.  Mabrey hired engineering consultants, conducted due-diligence investigations of SandStream, and made initial investments in SandStream's business.  Mabrey ultimately decided not to do business with SandStream.  *Id.*  After another potential deal failed, SandStream became suspicious and began looking into the business dealings of one of its competitors.  SandStream discovered that the competitor had employed two former SandStream engineers, was formed by an individual who had recently negotiated for SandStream's services and in the process had access to SandStream's confidential and proprietary information, and that Mabrey had provided funding for this competitor.  *Id.* at 307–08.  SandStream sued Mabrey, among others, on the theory that he knowingly aided and induced the former SandStream engineers to breach their fiduciary duties to SandStream.  The appellate court affirmed the trial court's injunction prohibiting Mabrey from using or disclosing "SandStream's confidential and proprietary information . . . or trade secret information."  *Id.* at 320, 321 n.49.  The injunction specifically excluded the use or dissemination of information that was obtained legally or with SandStream's permission. And the injunction did not prohibit Mabrey from investing or otherwise participating in businesses that competed with SandStream.  *Id.* at 321.

Similarly, in *ELCOR Chemical*, a Texas appellate court expanded the scope of the trial court's injunction prohibiting individuals from disclosing to their new employer trade secrets learned through their former employment. *ELCOR Chem.*, 494 S.W.2d at 210. The individuals had taken their former employer's trade secret information, used it to develop their own business, and obtained financing from a private backer who was fully aware of the improper use of the trade secrets. The appellate court expanded the injunction's scope to preclude the third parties from using or disclosing the misappropriated trade secrets. *Id.* at 213. The injunction did not, however, preclude the third party from continuing to provide backing to the defendants' business.

The present record is inadequate to support a finding that Molleston knowingly aided Davis in breaching his fiduciary duties by misappropriating Anadarko's confidential or proprietary information. Even if the July 12, 2006 email Molleston sent to Rawson could support such a finding, Anadarko has not shown that under Texas law, it is entitled to an injunction precluding GeoSouthern from employing Molleston. The Agreed Order already in place requires Davis and GeoSouthern—and Molleston, as an agent of GeoSouthern—to refrain from retaining, using, or disclosing any of Anadarko's protected information. (Docket Entry No. 13). The balance of private harms and the public interest weighs against issuing an injunction that would also require GeoSouthern to terminate the employment of its vice-president, who is responsible for running its daily operations. As noted, those cases holding third parties liable for aiding the breach of fiduciary duties limit the relief to

preventing use or disclosure of protected information and do not support the additional relief Anadarko seeks.

Anadarko's application for a preliminary injunction prohibiting GeoSouthern from employing Molleston is denied.

## CONCLUSIONS OF LAW

Anadarko has met its burden of showing a likelihood of succeeding on the merits of its claim that Davis misappropriated Anadarko's confidential and proprietary information. Anadarko has also met its burden of showing that Davis used that information without authorization. Anadarko has not, however, met its burden of showing that it would suffer irreparable harm in the absence of preliminary injunctive relief beyond the agreed order that is already is place, or that the harm outweighs the hardship that such a preliminary injunction would cause Davis, GeoSouthern, and Molleston. Anadarko has not shown that the balance of the equities weighs in favor of granting a preliminary injunction that would prohibit Davis from working for any Anadarko competitor or prohibit GeoSouthern from employing Davis or Molleston, or that entry of such a preliminary injunction is in the public interest. Based on the present record, including the agreed permanent injunction previously issued, Anadarko's application for a preliminary injunction beyond the permanent injunction currently in place is denied.

## III.    The Motion for Sanctions

Anadarko alleges spoliation and moves for sanctions against GeoSouthern and Davis. Anadarko's counsel sent Bishop and Molleston a letter on September 6, 2006, the same day

54

suit was filed.  (Pl. Ex. 41).  The letter informed them of the suit and instructed them on their duties to preserve documents and electronic information that may be relevant.  The letter provided detailed instructions on preserving of paper documents and electronically stored information, including emails, records of internet activity, activity logs, supporting information, offline data storage, and physical documents.  Within days, at the instruction of his lawyer, Davis began deleting documents from his laptop, his GeoSouthern desktop, and the GeoSouthern server, and at the same time, copying these documents onto a thumb drive to return them to Anadarko.

Anadarko argues that sanctions are appropriate because Davis and GeoSouthern deleted electronically stored information that they were obligated to preserve.  Anadarko requests a range of sanctions, including entry of a default judgment, an adverse inference instruction, precluding Davis and GeoSouthern from submitting certain evidence and raising certain defenses, and monetary sanctions.

Spoliation can occur when a party destroys discoverable information that it has a duty to preserve.  *Smith v. United States*, 293 F.3d 984, 988 (7th Cir. 2002) (*citing Crabtree v. Nat'l Steel Corp.*, 261 F.3d 715, 721 (7th Cir. 2001)); *Zubulake v. UBS Warburg, LLC*, 220 F.R.D. 212, 216 (S.D.N.Y. 2003).  To determine whether the deletion of electronically stored information amounts to spoliation, a court must analyze whether that information was subject to a preservation duty.  *Zubulake*, 220 F.R.D. at 216.  If a court finds spoliation, whether and what sanction is appropriate depends on whether the party acted in bad faith and the extent of any prejudice that resulted.  The Fifth Circuit requires a finding that relevant information

55

was destroyed in bad faith.  *See King v. Il. Cent. R.R.*, 337 F.3d 550, 556 (5th Cir. 2003); *United States v. Wise*, 221 F.3d 140, 156 (5th Cir. 2000).  The severity of any sanction should be proportionate to the culpability involved in the destruction and the prejudice that resulted.  *See Schmid v. Milwaukee Elec. Tool Corp.*, 13 F.3d 76, 78 (3d Cir. 1994); *Dillon v. Nissan Motor Co., Ltd.*, 986 F.2d 263, 267 (8th Cir. 1993).

This is an unusual set of facts for a spoliation claim.  In most cases in which a party asserts that the alteration or deletion of electronically stored information amounts to spoliation, the party wanted that information to remain available in the form that it was maintained by the other party.  In this case, by contrast, Anadarko specifically asked Davis and GeoSouthern to return all the electronically stored confidential and proprietary information Davis had taken from Anadarko and to prevent anyone at GeoSouthern from accessing or using that information.  That request makes it necessary for GeoSouthern to make the Anadarko information Davis had placed on the GeoSouthern computer system inaccessible, which requires that such information be deleted.  The second aspect that distinguishes this case from the typical spoliation case is that at the same time Davis deleted the information from the GeoSouthern computers and his own laptop, he testified that he placed the information on a thumb drive and delivered it to Anadarko.  In most spoliation cases, when information is deleted, no other record of its existence is created, much less promptly produced to the other side.  The third aspect that distinguishes this case is that Davis and GeoSouthern have agreed to allow Anadarko to conduct a forensic audit of their

computer systems to ensure that no proprietary or confidential Anadarko information remains accessible and to ensure that Davis returned all that he took.

Davis and GeoSouthern could have avoided this issue had they approached Anadarko's request to have its protected information returned and kept from dissemination in a different fashion. Davis and GeoSouthern could have conferred with Anadarko and, if necessary, involved the court, to design and implement steps to sequester the Anadarko information without deleting it from their computers. The fact that Davis and GeoSouthern acted unilaterally to attempt to satisfy Anadarko's request that the information Davis took be returned and protected from dissemination, disclosure, or use created the issue. As a result, Anadarko asserts that it is harmed because it cannot verify that all the information Davis took has in fact been returned. Their contention is supported, at least superficially, by the discrepancy in the volume of electronically stored information Davis took compared to what he returned.

In apparent recognition of these issues, Davis and GeoSouthern have since agreed to a court-ordered forensic audit of their computers. That audit is in progress. The audit should provide information as to whether Davis and GeoSouthern have removed from their computer systems the protected Anadarko information that Davis misappropriated and whether Davis and GeoSouthern have returned all that information. The present record does not support a finding that when Davis and GeoSouthern deleted the information from their computers and put it on a thumb drive to return to Anadarko, they acted in bad faith, as necessary to support the adverse inference Anadarko seeks. *See King*, 337 F.3d at 556; *Wise*,

221 F.3d at 156.  The alleged spoliation currently does not support the issuance of a broader injunction than is presently in place to protect Anadarko's trade secrets from unauthorized use or disclosure.  Because the parties' computer experts are still conducting their forensic examination of GeoSouthern's and Davis's computers, the record necessary to rule on the spoliation motion and determine whether and what sanction should issue is incomplete.  This court orders Anadarko to supplement its motion for sanctions within 30 days of the completion of the forensic analysis.  GeoSouthern's response will be due 20 days thereafter.

## IV.    Conclusion

Anadarko's application for preliminary injunction preventing Billy Don Davis from working for any Anadarko competitor and preventing GeoSouthern from employing Davis or Margaret Molleston is denied.  Anadarko must supplement its motion for sanctions based on spoliation within 30 days after the computer forensic analysis is completed.  GeoSouthern will have 20 days to respond.  The parties are ordered to appear for a status and scheduling conference on January 22, 2007, at 4:00 p.m., in Courtroom 11-B.

SIGNED on December 28, 2006, at Houston, Texas.

_____
Lee H. Rosenthal
United States District Judge

58